Filed Jan. 24, 1885.

No. 10,998.

ADAMS ET AL. *v.* SULLIVAN.

WAREHOUSEMAN.—*Evidence.— Unsigned Memoranda.*—In an action against a warehouseman to recover for damages to eggs stored in his warehouse, unsigned slips of paper upon which were written by plaintiff's employees the number and quality of eggs in each barrel when stored, and also the relative number of good and bad eggs when they were withdrawn from storage, and which were then reported to plaintiff's book-keeper, and a synopsis of each entered upon his books, do not constitute the best evidence of such facts, and parol evidence thereof is admissible.

SAME.—*Measure of Damages.—Instruction.*—In such case, an instruction, which, in effect, tells the jury that in making up the amount of damages, in the event of a finding for the plaintiff, the eggs should be estimated at the highest market price which the plaintiff could have obtained for them, at the time they were injured, is erroneous, as they should be estimated according to their market value in the locality where they were injured, and, if the time be indefinite and the market fluctuating, the average range of prices would be the proper standard of their market value.

EVIDENCE.— *Witness.—Expert.—Time.—Remoteness.—Discretion of Court.*— Where B. is called as a witness by the defendant to impeach the competency of F., a witness for plaintiff, in a particular employment, and it is proposed to prove by B. that three or four years previously F. had been in his service, and that he was neither an expert nor a competent person for such particular employment, the trial court may exclude such testimony as too remote, as in such cases the remoteness or proximity of the time rests very much in the discretion of the *nisi prius* court.

Adams *et al. v.* Sullivan.

SAME.—*Proof of Reputation.*—*Particular Employment.*—Proof of reputation is not admissible to show what a party's relations are to a limited number of persons, or what his qualifications may be for some merely private pursuit, or whether he is skilled in some particular employment.

From the Marion Superior Court.

*R. N. Lamb* and *S. M. Shepard,* for appellants.
*C. Byfield* and *L. Howland,* for appellee.

NIBLACK, J.—The appellants, David M. Adams and James C. Adams, doing business in the firm name of the Adams Packing Company, were, during the summer and fall of the year 1881, the proprietors of a warehouse in the city of Indianapolis, containing what was known as a " cold storage room," claimed to be, amongst other things, specially adapted to the storage of eggs and butter. The appellee, John E. Sullivan, was, during the same period of time, in the general produce business in the same city, which included the purchase, handling and sale of eggs and butter. Commencing on the 8th day of June and ending on the 5th day of September in said year 1881, Sullivan deposited in the cold storage room in question the aggregate amount of two hundred and twenty-nine barrels of eggs and fifty or more tubs of butter for safe-keeping. When Sullivan withdrew these barrels of eggs and tubs of butter for sale and consumption late in the fall, he claimed to have found them all in a more or less damaged condition, and this action was instituted for the alleged failure of the appellants to take proper care of the eggs and butter while stored in their warehouse. Verdict for the plaintiff at special term, assessing his damages at the sum of $897.50. New trial denied, and judgment on the verdict. Judgment affirmed at general term.

As regards the eggs, the manner in which they were handled, stored and prepared for market, was first shown by the evidence. It was in this way made to appear that when eggs were gathered in either by wagons or from shipments by railroad, they were put into a dark room, where they were examined and tested by an employee of the plaintiff known to

those engaged in buying and selling eggs as a "candler." This examination was made by the candler placing each egg between his eyes and a light, by means of which he was enabled to test the quality of each egg, and to classify it accordingly. The eggs were then taken by another employee known as a "packer," and packed in oats into barrels, putting the best quality together and calling them "A" eggs, and those not so good together and calling them "B" eggs, throwing away all the rest as bad eggs. When the eggs were withdrawn from the warehouse, they were *candled* in the same manner as above, before they were thrown upon the market. When the packer filled a barrel, he wrote on a slip of paper something denoting the quality of the eggs and the number of dozen the barrel contained. These slips were reported from time to time to the book-keeper, who entered a synopsis of the information they conveyed upon the plaintiff's books. After the eggs were withdrawn from the warehouse and again examined, the number of good, as well as of bad eggs, found in each barrel respectively, was written on a slip of paper, and in this way the condition of the eggs in each barrel was, at different intervals of time, reported to the book-keeper, who, also, entered a synopsis of what each slip contained upon the books of the plaintiff.

A young woman was book-keeper for the plaintiff during the summer and fall of 1881, and as a witness in his behalf first testified to and explained the manner in which the number and quality of the eggs stored in the warehouse, as well as their condition after they were withdrawn, were reported to her, and to the disposition made of the slips of paper from which she made entries in the books in her charge. She was then asked: "From these reports you may state what number of good and what number of bad eggs were * * * stored in the Adams Packing House?" This question was objected to by the defendants, but the witness was permitted to answer it, giving the aggregate number of the good eggs, as well as of the bad eggs, as they had been reported to her.

It is insisted that the court erred in permitting this question to be answered, upon the ground that the slips of paper constituting the reports made to the witness were the best evidence and ought to have been produced. But these slips of paper were only unsigned memorandums, which of themselves proved nothing and would have required the support of parol or other evidence, to have made them evidence for any purpose. The best evidence of the relative numbers of the good to the bad eggs was the testimony of the men who handled them. The slips of paper and entries in the books were but collateral and incidental circumstances, constituting mere links in the chain of the evidence. They were but collateral and incidental matters proper to be used in testing the accuracy of testimony given by those who claimed to have examined and counted the eggs.

General footings, or aggregate amounts, may be testified to by a witness who is familiar with them, for the purpose of testing the accuracy of more detailed statements in the evidence, or when necessary to make out a merely *prima facie* case. *Thornburgh* v. *New Castle, etc., R. R. Co.,* 14 Ind. 499; 1 Greenl. Ev., sections 117, 118, 119 and 120. There was no error, therefore, in permitting the question to which objection was made to be answered.

One Foster was *candler* for the plaintiff at the time the eggs were examined and packed in barrels preparatory to being stored in the warehouse, and he testified to having had eight or nine years experience as a *candler,* and in the handling of eggs. He was not called as an expert, but was examined as to the number and quality of the eggs which went into the warehouse, and as to facts generally coming to his knowledge while in the plaintiff's employment.

The defendants, at the proper time, called one Budd as a witness, who testified that he had been in the business of buying, handling and selling eggs and butter for twenty-one years; that he was acquainted with Foster; that he had had Foster in his employment three or four years previously.

The defendants thereupon proposed to prove by Budd that Foster was neither an expert nor a competent person for the *candling* of eggs, but the court declined to allow the proposed proof to be made, upon the ground that the time of Foster's employment by Budd was too remote; and, in that respect, we know of nothing which would sustain us in holding that the court did not decide correctly. In such cases the remoteness or proximity of the time indicated, relatively speaking, rests very much in the discretion of the *nisi prius* court.

One Neal was also a *candler* for the plaintiff when a considerable part of the eggs were examined and assorted, after they were withdrawn from the warehouse. He testified to having had experience as a candler of eggs, and to the general condition of the eggs and barrels containing them which he examined.

Budd further stated that he was acquainted with Neal personally; also, with Neal's reputation amongst his neighbors and business associates as a candler and handler of eggs. The defendants then offered to prove by Budd that Neal's reputation in that respect was bad amongst his neighbors and those having business associations with him, but the court refused to permit the proffered proof to be made, upon the ground that such proof was not admissible, either to show Neal's incompetency or to impair the value of his testimony. When a person is admitted to testify as an expert merely, the manner in which, and the extent to which, his competency as an expert may be questioned, is a subject upon which there is some obscurity in the authorities, but, although referred to in argument, the subject is one not directly involved in the proper decision of this cause. *Laros* v. *Commonwealth*, 84 Pa. St. 200; Ordronaux Jurisp., section 117; Whart. Crim. Ev., section 409.

Proof of reputation, as a general rule, applies only to the relations which a party sustains in some respect to the public, and to such things as, from their very nature, are ordinarily incapable of the usual means of proof, such as pedigree, re-

lationship, character, prescription, custom, boundary, reputed ownership and general rumor. It is admissible to establish what has generally, but imperceptibly, come to be recognized as an existing condition or state of affairs touching some matter to which the attention and observation of society have been directed, and concerning which there has been a concurrence of many voices, but not to prove what a party's relations are to a limited number of persons, or what his qualifications may be for some merely private pursuit, or whether he is skilled in some particular employment. These are matters susceptible of direct proof, and the usual means to establish them must be resorted to. Starkie Ev. 45 ; 1 Greenl. Ev., section 101 ; *Walker* v. *Moors,* 122 Mass. 501 ; Best Princ. Ev., section 497, *et seq.* It follows that the proposed evidence, as to the reputation of Neal as a candler and handler of eggs, was properly excluded.

One of the instructions given by the court to the jury, known as No. 8, first enumerated many circumstances which they ought to take into consideration in assessing the plaintiff's damages, in the event that they found for him, and concluded as follows: "The plaintiff is, however, entitled to recover the highest market price he could have obtained at the time of the injury for the goods, had the defendants fully performed their duty and properly preserved the goods during the time they were bound under their contract to keep them in storage."

There is some obscurity in the phraseology of this instruction, when considered with reference to its application to the evidence, but we construe so much of it as is set out above, when taken in connection with what preceded it, to have meant that in making up the amount of damages, in the event of a finding for the plaintiff, the eggs should have been estimated at the highest market price which the plaintiff could have obtained for them, whether by shipment or otherwise, at the time they were injured.

The authorities bearing directly upon the question in-

volved are very meager, but, as thus construed, and judged of in the light of all the analogies which occur to us, the instruction can not be sustained. The jury ought to have been told that in assessing the damages, the eggs should have been estimated according to their market value in the city of Indianapolis, when they were injured.

The rules for the assessment of damages in actions of trover, for breach of a contract to be performed at a particular place, and for injuries to goods *in transitu* by common carriers, concurrently sustain us in the conclusion we have reached, adverse to the correctness of the instruction set out in part as above. Besides, when the market is fluctuating and the precise time somewhat indefinite, the average range of prices about the time inquired of affords the proper standard of the market value of a commodity. 2 Sutherland Dam. 374.

Various general and, in some instances, hypothetical questions were asked of witnesses by the defendants concerning the business of buying, handling and storing eggs, which tended, in a greater or less degree, to test the accuracy of some of the statements made by witnesses for the plaintiff, but were held to be improper questions by the court. We will not attempt to set out, or comment in detail upon, any of those questions, as the judgment must, at all events, be reversed.

It is sufficient for our present purpose to remark that, in our opinion, some of those questions were erroneously excluded, and that, in consequence, the defendants were not, in some instances, allowed the latitude to which they were entitled in their efforts to break the force of some of the testimony produced against them.

The judgment at general term is reversed, with costs, and the cause remanded with instructions to reverse the judgment at special term.

Filed Jan. 30, 1885.